# SUPREME COURT OF THE UNITED STATES

_____

No. 23–5145 (23A51)

_____

## JAMES EDWARD BARBER _v._ KAY IVEY, GOVERNOR OF ALABAMA, ET AL.

ON APPLICATION FOR STAY AND ON PETITION FOR A WRIT OF
CERTIORARI TO THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

[July 21, 2023]

The application for stay of execution of sentence of death presented to JUSTICE THOMAS and by him referred to the Court is denied. The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting from the denial of application for stay.

Just last year in Alabama, in three consecutive executions by lethal injection, prison officials spent multiple hours digging for prisoners' veins in an attempt to set IV lines. Two of the men survived and reported experiencing extreme pain, including, in one case, nerve pain equivalent to electrocution. After those executions failed, the State began what it claimed would be a "top-to-bottom" review of its lethal injection process. _Barber_ v. _Governor of Ala._, ___ F. 4th ___, ___, 2023 WL 4622945, *13 (CA11, July 19, 2023) (Pryor, J., dissenting). During this review, conducted by the very agency that botched the executions, the State offered no explanations for the failures and reported "[n]o deficiencies" in its protocols. _Id.,_ at *15.

Now, the State seeks to execute James Edward Barber. Barber has timely raised an Eighth Amendment method of execution claim in federal court, arguing that he will be

subject to the same fate as last year's prisoners. Yet Alabama plans to kill him by lethal injection in a matter of hours, without ever allowing him discovery into what went wrong in the three prior executions and whether the State has fixed those problems. The Eighth Amendment demands more than the State's word that this time will be different. The Court should not allow Alabama to test the efficacy of its internal review by using Barber as its "guinea pig." *Id.,* at \*11. It should grant Barber's application for a stay of his execution.

## I

Governor Kay Ivey paused executions in Alabama and ordered a review of the State's execution protocols after three lethal injections in a row went wrong. First, in July 2022, Joe Nathan James, Jr., was concealed behind a curtain for three hours as medical personnel struggled to establish IV access. There were no witnesses to what happened other than those personnel but a state autopsy revealed James had been punctured multiple times, including at both of his inner forearms, wrists, and hands, as well as his right foot. After the curtain between the execution chamber and the observation room finally lifted, observers reported that James was nonresponsive. He never spoke the last words he had allegedly planned.

Alabama next tried to execute Alan Eugene Miller in September. Beforehand, in an affidavit, the commissioner of the Alabama Department of Corrections (ADOC) swore that, despite the evident problems with the James execution, ADOC was "'ready to carry out [Miller's] sentence by lethal injection.'" ___ F. 4th, at ___, 2023 WL 4622945, \*20 (Pryor, J., dissenting). Nevertheless, medical personnel spent one and a half hours puncturing both of Miller's elbows, arms, and his right hand and foot in an attempt to establish IV access. Miller reported that a puncture in his foot "'caused sudden and severe pain'" like he "'had been

electrocuted,'" likely because attempts to access a vein in his foot hit a nerve. *Id.,* at \*19. His "'entire body sh[ook] in the restraints.'" *Ibid.* Shortly before midnight, when his death warrant was set to expire, the execution was called off.

Just two months later, in November, Alabama tried to execute Kenneth Eugene Smith. Medical personnel spent an hour repeatedly puncturing Smith's elbows, arms, and hands in their attempts to locate a vein. Eventually, they tilted him upside down, bringing his feet above his head. Smith reported that they began injecting an unknown clear substance into his neck area. Finally, medical personnel attempted a central line procedure, which involves trying to insert a longer catheter into a large vein in the torso before it enters the heart. The IV team's move from his extremities to his collarbone to attempt the central line procedure terrified Smith because he had no idea what was happening. The repeated needle insertions in that area felt like "'stabbing.'" *Id.,* at \*13. After the central line procedure failed, the execution was called off.

Four days after Smith's failed execution, in November 2022, Governor Ivey paused all executions in Alabama, including Barber's. Rather than convene an independent investigation, as other States had done, see n. 1, *infra*, the Governor asked ADOC (the agency responsible for the faulty executions) to conduct a "'top-to-bottom review'" of the state's lethal-injection execution process. \_\_\_ F. 4th, at \_\_\_, 2023 WL 4622945, \*13. A little under three months later, ADOC reported that its review was complete. ADOC claimed that it was "'as prepared as possible to carry out death sentences going forward, consistent with the Constitution.'" 1 App. to Pet. for Cert. 75a. There was no published report. Instead, the ADOC commissioner's one-and-a-half page letter to the Governor, without reporting any flaws or explanations for the prior failures, reported

ADOC's decision "'to add to its pool of available medical personnel for executions,'" and that it had "'ordered and obtained new equipment.'" ___ F. 4th, at ___, 2023 WL 4622945, *14. The commissioner also noted that ADOC now had more time to carry out executions. Under new rules from the Supreme Court of Alabama, death warrants no longer expire at midnight, but instead last as long as a "'time frame'" set by the Governor permits. *Id.,* at *14, n. 7.

On the same day ADOC concluded its review, Governor Ivey moved the Alabama Supreme Court for permission to set Barber's execution date. Barber opposed the motion in state court and asked for discovery into ADOC's internal review. After the Alabama Supreme Court denied Barber's requests, he filed this case in federal court, alleging that his Eighth Amendment rights would be violated if Alabama attempted to execute him by lethal injection and requesting that he instead be executed using nitrogen hypoxia (a state-approved alternative), which would not require setting an IV line. Five days later, Governor Ivey set the date for Barber's execution on July 20, 2023, which was less than two months away.

Barber moved for a preliminary injunction and sought information about ADOC's review. He received little response other than assertions of privilege and a cursory statement that the review found "'[n]o deficiencies.'" 1 App. to Pet. for Cert. 175a. The District Court denied Barber's motion and he appealed to the Eleventh Circuit, requesting a stay of his execution. The Eleventh Circuit affirmed the District Court's denial of Barber's motion for a preliminary injunction and denied his request for a stay. Judge Jill Pryor dissented, arguing that Barber has "raised a serious and substantial Eighth Amendment claim that the pattern [of botched executions] will continue to repeat itself." ___ F. 4th, at ___, 2023 WL 4622945, *25. I agree with her concerns that ADOC has refused to provide discovery that could answer crucial questions about what caused past

problems with Alabama's executions and how any changes would address those specific causes.

## II

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." It forbids "'punishments of torture, . . . and all others in the same line of unnecessary cruelty,'" in which "'terror, pain, or disgrace [are] superadded' to the sentence." *Baze* v. *Rees*, 553 U. S. 35, 48 (2008) (plurality opinion) (quoting *Wilkerson* v. *Utah*, 99 U. S. 130, 135–136 (1879)). A method of execution violates the Eighth Amendment when it causes "a '"substantial risk of serious harm,"'" an objectively intolerable risk of harm that prevents prison officials from pleading that they were '"subjectively blameless for purposes of the Eighth Amendment."'" *Glossip* v. *Gross*, 576 U. S. 863, 877 (2015) (quoting *Baze*, 553 U. S., at 50). For instance, "'a series of abortive attempts [at execution]' unlike an 'innocent misadventure,' would demonstrate an '"objectively intolerable risk of harm"'" that officials may not ignore." *Id.*, at 50 (plurality opinion) (citation omitted).

Barber has alleged that ADOC's attempt to insert an IV line to administer lethal injection presents him with a substantial risk of serious harm based on its track record of faulty and failed executions. Clearly, something went wrong in Alabama in 2022. Although much about what happened is still mysterious, the State had "'a series of abortive attempts'" at execution. *Ibid.* At the least, medical personnel in three consecutive executions spent hours repeatedly puncturing prisoners in increasingly painful attempts to locate a vein for an IV line. They failed entirely in two of the three instances, despite likely puncturing at least one man's nerve. Based on the testimony of the surviving prisoners, these attempts caused "'great pain and fear,'" \_\_\_ F. 4th, at \_\_\_, 2023 WL 4622945, *19, over and above what anyone should experience from the setting of an

IV line.

Yet the State has never accounted for these issues. There is no evidence in the record explaining what may have caused such difficulties. Nor is there evidence that the State has addressed what went wrong. It has replaced its IV team with new members, but revealed nothing about how those members are different from or similar to its 2022 team. It has obtained new medical equipment, which it described in its discovery responses as solely "'[a]dditional straps for securing an inmate on the execution gurney.'" *Id.,* at *14, n. 6. Finally, ADOC has secured several more hours in which to carry out its executions. These piecemeal changes appear designed only to ensure that ADOC has an even greater period of time in which to search the bodies of its prisoners for IV access. They do not address the unnecessary pain those prisoners may experience. Indeed, the State represented to the District Court that it considered James' execution "successful" solely because ultimately it succeeded in killing him. 2 App. to Pet. for Cert. 454a. Without any evidence about what went wrong and only the State's word that it has been fixed, Barber's allegations that he will experience the same "needless suffering" as James, Miller, and Smith are more than justified.

Barber is not to blame for the lack of factual development in his case. Alabama, unlike other States that have sought to address issues with their lethal injection protocols,[1] has

_____

[1] In contrast to Alabama's cursory and largely secret review, other States facing a similar history of issues with their executions have conducted thorough investigations resulting in public reports. For example, in October 2015, the Oklahoma Attorney General asked for a pause in executions. He convened a 77-county grand jury to investigate issues with two lethal injection attempts. The grand jury received evidence over eight months and issued an over 100-page report detailing specific failures with the execution attempts. See Oklahoma Office of the Attorney General, Press Release, AG Pruitt Announces Conclusion of MCGJ Investigation of DOC, Execution Protocol (May 19, 2016). Similarly, in May 2022, the Tennessee Governor appointed U. S. Attorney Ed Stanton

conducted a secret, internal review with no published report or finding. The State has not only failed publicly to account for what went wrong, but also actively obstructed Barber's attempts to find out what happened. Because Governor Ivey set Barber's execution for a date only two months after he filed his complaint, discovery was necessarily abridged and the State, within that abridged discovery, provided hardly any information about its investigation or its new process.

After an unbroken sequence of faulty executions, Alabama asks the Court to trust that this time will be different. If it takes hours to set Barber's IV line, like Miller and Smith before him, the State may subject Barber to an intolerable level of pain under the Eighth Amendment. If it successfully executes him anyway, like James, it will have mooted his claim. The Eighth Amendment does not tolerate playing such games with a man's life. I, like Judge Pryor, would stay Barber's execution for long enough to allow the district court to complete full discovery into what went wrong with the 2022 executions and what has been done to address it. Only then can it make an informed decision about the merits of Barber's Eighth Amendment claim.

### III

Today's decision is another troubling example of this

_____

to conduct an independent review of the State's execution process. The review produced a 166-page independent report that detailed the investigation's methodology and scope, the issues with a specific scheduled execution, and detailed findings and recommendations. See Butler Snow LLP, Tennessee Lethal Injection Protocol Investigation: Report & Findings (Dec. 13, 2022). Most recently, in January 2023, the Arizona Governor established a Death Penalty Independent Review Commissioner tasked with reviewing the State's execution protocols after alleged issues inserting an IV line during three recent executions. Arizona, Executive Order No. 2023–05, Establishing a Death Penalty Independent Review Commissioner; see J. Jenkins, States Under Scrutiny for Recent Lethal Injection Failures, Arizona Republic (Nov. 22, 2022).

Court stymying the development of Eighth Amendment law by pushing forward executions without complete information. In both Miller and Smith's cases, this Court issued unreasoned orders vacating long, well-reasoned stays issued by the Eleventh Circuit.[2] See *Hamm* v. *Miller*, 598 U. S. ___ (2022); *Hamm* v. *Smith*, 598 U. S. ___ (2022). Both Miller and Smith argued that Alabama would likely botch their execution just as it had botched preceding executions. They were both right. Had this Court not vacated the Eleventh Circuit's stays, perhaps the State would have been forced to produce evidence in discovery that could explain what kept going wrong and avoided inflicting unnecessary pain on these two men.

This Court has so prioritized expeditious executions that it has disregarded well-reasoned lower court conclusions, preventing both the meaningful airing of prisoners' challenges and the development of Eighth Amendment law. Cf. *United States* v. *Higgs*, 592 U. S. ___ (2021) (SOTOMAYOR, J., dissenting) (slip op., at 2) ("The Court has . . . intervened to lift stays of execution that lower courts put in place, thereby ensuring those prisoners' challenges [to a new federal execution protocol] would never receive a meaningful airing"). Unfortunately, lower courts are receiving the message. The Eleventh Circuit here made both factual and le-

---

[2] In Miller's case, the District Court had issued a preliminary injunction, which the Eleventh Circuit upheld in a 20-page opinion. *Miller* v. *Comm'r, Ala. Dept. of Corrections*, No. 22–13136, ECF Doc. 19–1, p. 20 (CA11, Sept. 22, 2022) (*per curiam*). In Smith's case, the Eleventh Circuit reversed the District Court's denial of his motion to amend his complaint in a long, well-reasoned opinion holding that he had stated a plausible Eighth Amendment claim to relief. *Smith* v. *Comm'r, Alabama Dep't of Corrections*, No. 22–13781, 2022 WL 17069492 (CA11 Nov. 17, 2022) (*per curiam*), cert. denied, 598 U. S. ___ (2023). Hours later, the Eleventh Circuit granted Smith a stay of his execution to allow him to pursue that claim. *Smith* v. *Comm'r, Ala. Dept. of Corrections*, No. 22–13846, ECF Doc. 10–1 (CA11, Nov. 17, 2022).

gal errors seemingly based on this Court's unreasoned vacaturs.

First, in denying Barber's request for a stay, the Eleventh Circuit emphasized that this Court had previously vacated its grant of Smith's stay. "By vacating the stay," the panel reasoned, "the Supreme Court implicitly told us that the balance of equities in *Smith* weighed in favor of the State's and the victim's strong interest." \_\_\_ F. 4th, at \_\_\_, n. 19, 2023 WL 4622945, *8, n. 19 (majority opinion). That is plainly wrong. Under well-established equitable principles, courts evaluating a stay must consider the applicant's likelihood of success on the merits and potential for irreparable injury, as well as other parties' injury and the public interest. See *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). Barber has established a substantial likelihood of success on the merits of his claim that he will suffer a substantial risk of harm when ADOC attempts to set his IV line. Barber submitted evidence that Alabama has subjected three prisoners to unnecessary pain and terror through its struggles to set their IV lines during lethal injection executions. The State has failed to produce any evidence that it has identified or remedied these problems. Additionally, in a capital case like Barber's, where a plaintiff has diligently pursued his method-of-execution claim and asked only for an injunction that permits an alternative, available method of execution, the equities of irreparable harm tip strongly in his favor. See *Bucklew* v. *Precythe*, 587 U. S. \_\_\_, (2019) (SOTOMAYOR, J., dissenting) (slip op., at 3) ("[T]he equities in a death penalty case will almost always favor the prisoner so long as he or she can show a reasonable probability of success on the merits"). For the State, the harm is using an alternative method of execution that it has already approved. It can still vindicate its interest in enforcing the criminal judgment. Far more consequentially for the plaintiff, the potential harm is experiencing excruciating and unnecessary pain.

Second, the Eleventh Circuit appears to have concluded that "repeatedly and futilely pricking an inmate with a needle does not rise to an unconstitutional level of pain." ___ F. 4th, at ___, n. 20, 2023 WL 4622945, *8, n. 20 (majority opinion); see *id.*, at 19 (Pryor, J., dissenting). This Court's precedent forecloses any such categorical rule. Whether a given method of execution creates a "substantial risk of serious harm" is a fact-intensive inquiry. A court must analyze whether a given method "'creates a demonstrated risk of severe pain'" to a particular plaintiff. *Glossip*, 576 U. S., at 878 (quoting *Baze*, 553 U. S., at 61 (plurality opinion)). Evidence of past faulty or failed executions is relevant to that analysis. *Id.*, at 50. So is the potential pain or suffering caused by the suggested alternative. See *Bucklew* v. *Precythe*, 587 U. S. ___, ___ (2019) (slip op., at ___). Here, the District Court would have needed several kinds of information to assess the risk of serious harm resulting from setting an IV line. At a minimum, it had to know ADOC's standard process for setting IV lines, including the expertise of the team setting the line. For instance, if an IV team contains no one with meaningful experience setting hard-to-access IV lines, that would be relevant to the risk of serious harm if the team tries to insert one in any context. Only then could it know the impact and relevance of any of Barber's additional risk factors on his potential to experience unnecessary pain.

The Eleventh Circuit's categorical rule ignores crucial Eighth Amendment questions. How much pain or psychological torment amounts to serious harm? How long is too long to set an IV line? How many punctures with a needle, where, and how deeply, may cause superadded pain? These questions require a factual foundation, developed with the assistance of medical experts. The answers may be different in different cases, under different protocols, and with different people.

SOTOMAYOR, J., dissenting

If the Court continues to endorse state executions scheduled before meaningful discovery, these questions may never be answered. The harm is not speculative. Miller and Smith survived to describe the intense fear and pain they experienced during Alabama's tortuous attempts to execute them. This Court's intervention lifting stays granted by the Eleventh Circuit permitted those attempts. This Court's decision denying Barber's request for a stay allows Alabama to experiment again with a human life. I respectfully dissent.